UNITED STATES v. VAN SCHAICK et al. SAME v. BARNABY et al. SAME v. VAN SCHAICK.

(Circuit Court, S. D. New York. December 23, 1904.)

1. CRIMINAL LAW—VIOLATION OF NAVIGATION LAWS—MASTER.

While it is not primarily the duty of the master, under the statutes and inspectors' regulations, to equip a vessel with life preservers or fire apparatus, it is his duty before navigating to exercise care to know whether the ship has such equipment, and whether it is apparently sufficient and in accordance with law, and afterwards to exercise some care respecting

its maintenance, the extent of such care being dependent on his opportunities to examine the appliance and perceive its condition; other duties, relating to the posting of station bills for the crew, and their exercise in fire drill and the use of appliances, are imposed directly upon the master by rule 5, § 15, of the inspectors' rules and regulations; and his neglect of any of such duties, whereby the life of any person is destroyed, renders him subject to indictment and prosecution for manslaughter, under Rev. St. § 5344 [U. S. Comp. St. 1901, p. 3629].

**2. SAME—CORPORATE OWNER—AIDERS AND ABETTORS.**

A corporation owner of a steam vessel may be guilty of the offense stated in Rev. St. § 5344 [U. S. Comp. St. 1901, p. 3629], which provides that "every owner * * * through whose fraud, connivance, misconduct or violation of law the life of any person is destroyed shall be deemed guilty of manslaughter and upon conviction therefor * * * shall be sentenced to confinement at hard labor," etc., notwithstanding the fact that it cannot be subjected to the punishment imposed; and such fact does not affect the right of the government to prosecute individuals, under said section, who aid and abet the corporation in the commission of the crime.

**3. SAME.**

The owner of a steamship, who fails to comply with the statute requiring it to be equipped with life preservers and proper fire appliances, either by supplying none, or by supplying those that are unsuitable, inefficient, and useless, and do not conform to the inspectors' rules, is guilty of a "violation of law," and subject to prosecution under Rev. St. § 5344 [U. S. Comp. St. 1901, p. 3629], where such violation results in the death of a person; and in either case the offense is one which may be aided and abetted by a third person who "causes and procures" the omission, and such person may properly be charged in the indictment as a principal.

**4. SAME.**

In order to constitute an aider and abettor a principal in such offense, it is not necessary that he should have been present at the time it was consummated by the death of a person, since the conduct or omission which constituted the criminal breach of duty was continuous.

**5. SAME—SUFFICIENCY OF INDICTMENT.**

An indictment charging a violation of the statute and rules, in that, of the life preservers supplied and kept on a steamship for the use of passengers thereon, upward of 900 were unsuitable, inefficient, and useless, and not in accordance with the statutory requirement, is not bad because it does not also charge a failure to supply the requisite number of good life preservers; the furnishing to a passenger of a useless life preserver being as much a violation of the law as a failure to furnish him with any.

**6. SAME—BREACH OF DUTY BY MASTER CAUSING DEATH—DUTIES CREATED BY INSPECTORS' RULES.**

Inspectors' Rule 5, § 15, requiring masters of steam vessels to keep the fire apparatus thereon in complete working order, and to post station bills and exercise the crew in their duties in connection therewith, is within the power conferred on the board by Rev. St. § 4405 [U. S. Comp. St. 1901, p. 3017], and valid. It does not purport to create offenses, but merely to prescribe duties; but a breach of it, resulting from a master's misconduct, negligence, or inattention, causing death, is manslaughter, because so provided by Congress in Rev. St. § 5344 [U. S. Comp. St. 1901, p. 3629].

On Demurrers to Indictments.

Henry L. Burnett, U. S. Atty., and Ernest E. Baldwin, Asst. U. S. Atty. (William S. Ball, of counsel), for the United States.

Black, Olcott, Gruber & Bonynge (William M. K. Olcott and Terence J. McManus, of counsel), for defendants Van Schaick, Atkinson, and Dexter.

Dittenhoefer, Gerber & James (A. J. Dittenhoefer and Dudley F. Phelps, of counsel), for defendant Barnaby.

Hugo Hirsh, for defendant Pease.

THOMAS, District Judge. The above actions are known as the "Slocum Cases," and the present question involves a demurrer to each of the indictments in the three actions, numbered for convenience 1, 2, and 3, which are found under section 5344 of title 70 of the Revised Statutes [page 3629, U. S. Comp. St. 1901], which provides:

"Sec. 5344. Every captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel, the life of any person is destroyed, and every owner, inspector, or other public officer, through whose fraud, connivance, misconduct, or violation of law, the life of any person is destroyed, shall be deemed guilty of manslaughter, and, upon conviction thereof before any Circuit Court of the United States, shall be sentenced to confinement at hard labor for a period of not more than ten years."

The defendant Van Schaick was master of the steamboat General Slocum. She was owned by the Knickerbocker Steamboat Company, a corporation, whose managing directors and officers were the defendants Barnaby, president; Atkinson, secretary; Dexter, treasurer; while Pease was employed as the commodore of the fleet. Resort must be had to the indictments for a statement of the facts that are conceded for the purposes of the demurrers.

The Slocum was inspected by the inspectors of the United States on May 5, 1904, and thereupon permitted to navigate for a year the waters of the Bay and Harbor of New York, and rivers tributary thereto, Long Island Sound, and coastwise between Rockaway Inlet and Long Branch. On June 15, 1904, while navigating the East river, a fire occurred, and was so uncontrolled that many persons were compelled to jump into the water, and some 900 were drowned.

The indictments charge that the deaths were caused (1) by unsafe and unserviceable life preservers (indictment No. 1 and indictment No. 2, count 1; indictment No. 3, counts 1 and 2); (2) by unsuitable, inefficient, and useless life preservers, and incomplete and unfit equipment of steam pumps and hand pumps, so far as the weakness and unserviceability of the hose was concerned, and in that the hose was not provided for and attached to the steam pumps and hand pumps (indictment No. 2, count 2); (3) by the wrongful neglect of Van Schaick, the captain, to discipline and train his crew, whereby none of the crew knew or attended to his duty, and no attempt was made to unlash and swing out the lifeboats or the life rafts, in consequence of which the passengers were obliged to throw themselves into the water, and thereupon drowned on account of the useless and unfit life preservers. Three classes of persons are charged with breach of duty in regard either to the defective appliances or the discipline of the crew, or both, to wit, the owner of the vessel, the Knickerbocker Steamboat Company, Van Schaick, the master of the vessel, Barnaby, Atkinson, Dexter, and Pease.

Indictment No. 1 charges that Van Schaick was—

"Guilty of misconduct, negligence and inattention to duty on such vessel, as such master and captain, in that he then and there unlawfully had and

kept on said vessel, among other life preservers, adjustable to the bodies of human beings, which had been placed thereon for the use of the passengers and other persons on board of the said vessel in case of emergency, and intended for such use, divers, to wit, nine hundred and upwards, unsuitable, inefficient and useless life preservers; that is to say, in the respect that, according to the laws relating thereto, and the regulations thereunder, the said life preservers on said vessel were required to be in good order and accessible for immediate use, adjustable to the bodies of passengers and made of good, sound cork blocks, or other suitable material, with belts and shoulder-straps properly attached in the manner prescribed by the laws of Congress relating thereto and the rules and regulations thereunder as aforesaid, and that every such life preserver should contain at least six pounds of good cork, which should have a buoyancy of at least four pounds to each pound of cork; but in truth and in fact, large numbers of the same, to the amount of nine hundred and upwards as aforesaid, through the unlawful misconduct, negligence and inattention to his duties by the said master and captain, as aforesaid, were unsafe, unsuitable and unserviceable, so that, at the times aforesaid, while the said William H. Van Schaick was master and captain as aforesaid, of the said steamboat, the said life preservers, in large numbers, to wit, nine hundred of the same and upwards, were utterly useless for the protection and saving of human life, in that, in many instances, the covers thereof were rotten and not of sufficient strength and soundness to make them impervious to water, and the shoulder-straps and bands of the same were so decayed that it was impossible to securely fasten the said life preservers to the human body; and the said life preservers did not have the buoyancy required by law; and the unsuitability and the inefficiency and uselessness of the said life preservers for the purpose which they were intended to serve should have been known to the said William H. Van Schaick, and he might by the exercise of ordinary observation, and inquiry, have ascertained the same, and should so have ascertained before the said vessel started on the excursion hereinafter mentioned; and which said unsuitable and inefficient appliances, he, the said William H. Van Schaick, notwithstanding the premises, unlawfully caused, suffered and permitted to be and remain on said vessel, and he was guilty of misconduct, negligence and inattention to his duties upon said vessel, in that he permitted the said vessel to go, and took the said vessel, on said excursion, with the said unsuitable and inefficient life preservers on board, and caused, suffered and permitted, the same to be tendered and held out for the use of the passengers and other persons on board of said steamboat, at the time of her destruction by fire as hereinafter mentioned."

And indictment No. 1 further charges that Barnaby, Atkinson, Dexter, and Pease—

"Being such directors and commodore as aforesaid, did then and there unlawfully aid and abet the said William H. Von Schaick in his said unlawful misconduct, and inattention to his duties on said vessel as aforesaid, and cause, procure, suffer and permit him, then and there, the said misconduct, negligence and inattention to his duties, in manner and form aforesaid, so to engage in and commit as aforesaid."

Indictment No. 2 charges that the Knickerbocker Steamboat Company, the owner of the vessel, "Was guilty of fraud, misconduct and violation of law, in that the said company then and there unlawfully had and kept on said vessel" life preservers in violation of the requirements of law and regulation, specifically describing the requisites, and the condition in which said life preservers in fact were, and charges that:

"The said unsuitable, inefficient and unfit appliances the said Knickerbocker Steamboat Company, notwitstanding the premises, unlawfully caused, suffered and permitted to be and remain on the said vessel and to be tendered and held out to the passengers and other persons on board of the said vessel

for their use at the time of the happening of the fire hereinafter mentioned."

And that the defendants named in the indictment—

"Did then and there unlawfully aid and abet the said Knickerbocker Steamboat Company in its said fraud, misconduct and violation of law, and cause, procure, suffer and permit the said company then and there the said fraud, misconduct and violation of law, in manner and form as aforesaid, so to engage in and permit as aforesaid."

It is further charged in indictment No. 2 that:

"And it was then and there also the duty of the said Knickerbocker Steamboat Company to see that said steamboat was equipped with a good, double-acting steam pump, or other equivalent apparatus for throwing water, and that such pump or other apparatus should be kept at all times in good order, ready for immediate use, and that the same should have at least two pipes of suitable dimensions, one on each side of said vessel, to convey the water to the upper decks, to which pipes there should be attached by means of stop-cocks or valves, both between decks and on the upper deck, good and suitable hose of sufficient strength to stand the pressure of not less than one hundred pounds to the square inch, long enough to reach to all parts of the said vessel, and properly provided with nozzles, and kept in good order for immediate service. And it was also then and there the duty of the said Knickerbocker Steamboat Company to see that the said vessel was provided with two good, double-acting fire pumps, to be worked by hand, and that each of said hand pumps should have well fitted and suitable hose, at least one-half the length of said vessel, kept at all times in perfect order and ready for immediate use for the fighting of fire on the said vessel.

"And by the fraud, misconduct and violation of law by the said Knickerbocker Steamboat Company, the owner of the said steamboat, 'General Slocum,' although the said steamboat was provided, then and there, with the said steam pumps and the said hand pumps, as aforesaid, the said pumps then and there were not provided with, and did not have attached thereto, and ready for immediate use, the said hose, as aforesaid, required by law, in that, the hose, where the same was attached to the said steam pumps, namely, on the main deck of said vessel, was weak, unfit and unserviceable and was unable to stand the pressure as required by law, and on the hurricane and promenade decks of said steamboat no hose whatever was provided or attached to the said steam pumps; and in truth and in fact, no hose whatever was provided and attached, then and there, to the said hand pumps, or either of them, as required by law.

"And the unsuitability, inefficiency and uselessness of the said life preservers for the purposes which they were intended to serve; and the incomplete and unfit equipment of the said steam pumps and the said hand pumps as aforesaid, so far as the said weakness and unserviceableness of the said hose were concerned, and in the respect that hose was not provided for and attached to the said steam pumps and the said hand pumps, as hereinbefore recited, the said Knickerbocker Steamboat Company should have known and might by the exercise of ordinary observation and inquiry, have ascertained, before the said vessel started on the excursion, on the said 15th day of June, A. D., 1904, hereinafter more particularly mentioned. And the said unsuitable, inefficient, incomplete and unfit appliances, the said Knickerbocker Steamboat Company, notwithstanding the premises, unlawfully caused, suffered and permitted to be and remain on the said vessel, and to be held out to the passengers and other persons on said vessel, for their use, and suitable for their safety and protection at the time of the destruction of said steamboat by fire hereinafter mentioned."

And it is further charged in indictment No. 2 that the defendants Barnaby, Atkinson, Dexter, Pease, and Van Schaick—

"Did then and there unlawfully aid and abet the said Knickerbocker Steamboat Company in its said fraud, misconduct and violation of law, and cause,

procure, suffer and permit the said company then and there the said fraud, misconduct, and violation of law, in manner and form' as aforesaid, so to engage in and commit as aforesaid."

In addition to the above, it is charged against Van Schaick alone that he violated the regulations respecting fire drill. See rule 5, § 15, given below. Indictment No. 3, count 3, after alleging violation of such regulation, states:

"And by reason of the said unlawful misconduct, negligence and inattention to duty on said vessel, as aforesaid, on the part of the said William H. Van Schaick, so as aforesaid master and captain of the said steamboat, the said crew was without discipline or training as aforesaid, and did not know what to do in the said emergency; and no one of the said crew, nor any other person employed on board of said steamboat, had his post and station of duty, from the beginning of said fire until the final destruction of said vessel, because of it; or knew his duty or attended to the same; and so far as fighting said fire was concerned, being without discipline and without suitable hose and fire appliances, as aforesaid, no one of them attempted it, and no person, by reason of the said unlawful misconduct, negligence and inattention to his duties on said vessel by the said master and captain, was in command, or gave directions as to the suppression of the flames, and in consequence thereof, panic and confusion, without the semblance of order or discipline, prevailed, and said passengers were left to help themselves; and for the same reason, no attempt was made by the said crew, or any of them, to unlash and swing out the said lifeboats, or lower them, or the said life rafts, into the water; and in the absence of good order, through the aforesaid unlawful misconduct, negligence, and inattention to his duties on said vessel, of and by the said master and captain, the said passengers, in large numbers, were pushed and thrown into the water, and cast themselves therein to avoid perishing by the said fire; and the said life preservers then and there being useless and unfit for service, many of those who sought to use them, having adjusted said life preservers to their bodies, relying upon their suitability, efficiency and usefulness for the purpose which they were intended to serve, and for which they had been tendered and held out to them', cast and threw themselves into the waters of East river there, and sinking therein,.instantly died by drowning; and many others sank into the flames on board of said vessel and thereby instantly died."

And it is charged that by the—

"Unlawful misconduct, negligence and inattention to his duties on the vessel by the said William H. Van Schaick, the master and captain thereof, the lives of nine hundred persons * * * were then and there destroyed, some by burning and some by drowning, in manner and form aforesaid, and that thereby the said William H. Van Schaick, them, the said nine hundred human beings, in manner and form, and by the means aforesaid, unlawfully did kill and slay."

Who had a duty respecting (1) the life preservers; (2) the hose, and connection thereof with the pumps; (3) the discipline of the crew? Rev. St. U. S. § 4482 [U. S. Comp. St. 1901, p. 3054], provides:

"Sec. 4482. Every such steam-vessel carrying passengers shall also be provided with a good life-preserver, made of suitable material, for every cabin passenger for which she will have accommodation, and also a good life-preserver or float for each deck or other class passenger which the inspector's certificate shall allow her to carry, including the officers and crew; which life-preservers or floats shall be kept in convenient and accessible places on such vessel in readiness for immediate use in case of accident."

It is urged that the words "such vessel" refer to the preceding section, 4481 [page 3053], which relates to a "steam vessel navigating

rivers only, except ferryboats, freight boats, canal-boats, and towing boats, of less than fifty tons."

Sections 4488 and 4489 [pages 3055 and 3056] provide:

"Sec. 4488. Every steamer navigating the ocean, or any lake, bay, or sound of the United States, shall be provided with such numbers of life-boats, floats, rafts, life-preservers, line-carrying projectiles, and the means of propelling them, and drags, as will best secure the safety of all persons on board such vessel in case of disaster; and every sea-going vessel carrying passengers, and every such vessel navigating any of the Northern or Northwestern Lakes, shall have the life-boats required by law, provided with suitable boat-disengaging apparatus, so arranged as to allow such boats to be safely launched while such vessels are under speed or otherwise, and so as to allow such disengaging-apparatus to be operated by one person, disengaging both ends of the boat simultaneously from the tackles by which it may be lowered to the water. And the board of supervising inspectors shall fix and determine, by their rules and regulations, the kind of life-boats, floats, rafts, life-preservers, line-carrying projectiles, and the means of propelling them, and drags that shall be used on such vessels, and also the kind and capacity of pumps or other appliances for freeing the steamer from water in case of heavy leakage, the capacity of such pumps or appliances being suited to the navigation in which the steamer is employed.

"Sec. 4489. The owner of such steamer who neglects or refuses to provide such life-boats, floats, rafts, life-preservers, line-carrying projectiles, and the means of propelling them, drags, pumps, or appliances as are, under the provisions of the preceding section, required by the board of supervising inspectors, and approved by the Secretary of Commerce and Labor, shall be fined one thousand dollars."

It is urged that the indictment does not state under which section the General Slocum should have been equipped with appliances. If her equipment followed her license, she would fall under both sections. If the place of accident determines the requirement, for the purpose of these actions section 4482 is applicable. In either case it is considered that the primary duty of supplying proper life preservers fell on the owner. This will be discussed later.

Section 18, rule 3, of the general rules and regulations prescribed by the board of supervising inspectors, as amended January, 1904, and approved by the Secretary of Commerce and Labor, provides:

"Every life-preserver adjustable to the body of a person shall be made of good sound cork blocks or other suitable material, with belts and shoulder-straps properly attached, and shall be constructed so as to place the cork underneath the shoulders and around the body of the person wearing it, the shoulder-traps to be sewed on at least 8 inches apart on the back of the preserver, and sewed together at the angle where they cross the body, and must have also a strap across the breast from one shoulder-strap to the other, sewed fast at one end and with a buttonhole in the other, with a button on shoulder-strap to which the crosspiece can be buttoned, and that all belt life-preservers shall be not less than 54 inches in length, measurement from end to end around the body. And it shall be the duty of the inspector to see by actual examination that every such life-preserver contains at least 6 pounds of good cork, which shall have a buoyancy of at least 4 pounds to each pound of cork. Inspectors are further required to direct such life-preservers to be distributed throughout the cabins, staterooms, berths and other places convenient for passengers on such steamer; and there shall be a printed notice posted in every cabin and stateroom, and in conspicuous places about the decks, informing passengers of the location of life-preservers and other life-saving appliances, and of the mode of applying or adjusting the same. Cork cushions, when constructed of good sound cork blocks or other suitable material, with belts and shoulder-straps properly attached, said cushions to contain not less than 6 pounds of cork, when

passed by local inspectors, may be used in lieu of life-preservers on small pleasure steamers."

Passing to the question of fire equipment, section 4471 [page 3049, U. S. Comp. St. 1901] provides:

"Sec. 4471. Every steamer permitted by her certificate of inspection to carry as many as fifty passengers, or upward, * * * shall be provided with a good double-acting steam fire-pump, or other equivalent apparatus for throwing water. Such pump or other apparatus for throwing water shall be kept at all times and at all seasons of the year in good order and ready for immediate use, having at least two pipes of suitable dimensions, one on each side of the vessel, to convey the water to the upper decks, to which pipes there shall be attached, by means of stop-cocks or valves, both between decks and on the upper deck, good and suitable hose of sufficient strength to stand a pressure of not less than one hundred pounds to the square inch, long enough to reach to all parts of the vessel and properly provided with nozzles, and kept in good order and ready for immediate service. Every steamer exceeding two hundred tons burden and carrying passengers shall be provided with two good double-acting fire-pumps, to be worked by hand; each chamber of such pumps, except pumps upon steamers in service on the twenty-eighth day of February, eighteen hundred and seventy-one, shall be of sufficient capacity to contain not less than one hundred cubic inches of water; and such pumps shall be placed in the most suitable parts of the vessel for efficient service, having suitable well-fitted hose to each pump, of at least one-half the vessel in length, kept at all times in perfect order, and shipped up and ready for immediate use."

The subject of fire drill is covered by rule 5, § 15, Inspectors' Rules and Regulations, which is as follows:

"Sec. 15. It shall be the duty of the master of every inspected steamer of 30 net tons and over, carrying passengers on the ocean, lakes, gulf, or bays, when such steamer is under way, to cause to be prepared a station bill for his own department, and one, also, for the engineer's department, in which shall be assigned a post or station of duty for every person employed on board such steamer, in case of fire or other disaster; which station bills shall be placed in the most conspicuous places on board for the observation of the crew. And it shall be the duty of such master, or of the mate or officer next in command, once at least in each week, to call all hands to quarters and exercise them in the discipline, and in the unlashing and swinging out of the lifeboats, weather permitting, and in the use of the fire pumps and all other apparatus for the safety of life on board of such vessel, and to see that all the equipments required by law are in complete working order for immediate use; and the fact of the exercise of the crew, as herein contemplated, shall be entered upon the steamer's log book, stating the day of the month and hour when so exercised, and any neglect or omission on the part of the officer in command of such steamer to strictly enforce said rule shall be deemed cause for the revocation of the license of such officer. Upon navigable rivers the captains of all passenger steamers of 30 net tons and over shall be required to maintain a strict discipline and organize the officers and permanent crew so to act with promptness in case of fire or other disaster; and the captain shall cause to be prepared at least two station bills, assigning the officers and permanent crew to definite places. Said station bills shall be conspicuously placed, under glass, near the inspection certificate."

The duty of the master in respect to this rule and section 4471 will be later discussed.

It is now to be considered whether the master had any duty with reference to the life preservers and other appliances. It should be. kept firmly in mind that this question is not whether the duty, if it existed, required much or little diligence on the part of the master.

but rather whether the duty existed at all. Neither the statutes nor the inspectors' regulations make it the duty of the master to select, to provide, to test, or to maintain the prescribed life preservers, nor primarily to inspect and to discard those that originally or from time to time did not meet the requirements. Obviously the primary duty in this regard rests upon the owner of the vessel. It certainly cannot be maintained that the usual law requires that the master of a domestic vessel, navigated in a home port, shall equip her; and the statute, unless there be fitting words to that effect, prescribing the equipment, does not speak to the master. It commands the owner. Hence, if the owner did not perform the duty, it became liable, under section 5344, if death ensued in consequence of its violation of law; and, as considered later, if the master, managing officers, or others caused the violation of law, they are indictable as principals. This conclusion sustains the indictments against such persons for aiding and abetting the company; and so the indictment wherein Barnaby, Atkinson, Dexter, and Pease are charged with aiding and abetting the master, by procuring his misconduct, negligence, and inattention to his duties, would be sustainable, at least, because it charges that the master "unlawfully caused, suffered and permitted to be and remain on said vessel" the unsuitable and inefficient appliances. A further question is whether inattention to the condition of the life preservers, failure to discover defects, if they were obvious or discoverable by the observation demandable of the master of a vessel, was such negligence as would, in case death resulted therefrom, bring the master within section 5344, and whether Barnaby and the others could aid and abet such negligence.

While it is not the duty of the master to equip the vessel with life preservers, and while he may not be chargeable, in the first instance, with the duty of making what would be regarded as a proper inspection thereof, necessary to discover the presence or absence of the qualities and material required by law, yet it is the duty of the master of a vessel, aboard and in command, to use ordinary observation and inquiry, and if thereby, or if from report to him, he has notice of defects either in his vessel or equipment, some diligence is required on his part, tending to the restoration of the defective place or appliance. At least, it would be his duty to report the condition, and make requisition for repairs or sound facilities. Assume that no life preservers were provided; could the master, with actual or constructive knowledge, navigate the vessel with impunity? If he knows of some total omission of requisite equipment, itself perilous to human life, may he deliberately continue to navigate his vessel, wholly indifferent to any catastrophe that may result therefrom? It is thought that such attitude on the part of the master would not be tolerated. And so, if the master blindly uses what he is proffered, however bad or destructive it may be, or constructively or actually knows of defects, and does nothing, he is certainly not performing the duty of a master. It is not the duty of the master to provide the hull of the ship, yet, if he navigates his vessel without any care as to the condition of the hull, or with a hole in the bottom, of which he has knowledge, actual or constructive, and she sinks, and death thereby ensues, he would, it is thought, fall

within the punishment of section 5344. Much more evident would be his guilt if he caused the hole "to be and remain" in the vessel. In other words, if he suffered and permitted it to be and remain in such vessel, knowing or enabled to know, in the use of ordinary observation, of its existence and danger, he would be guilty; and he would likewise be guilty if he caused the defective thing to be on the vessel and to remain thereon. The master's duty requires him to exercise some care to discover both the soundness and safety of the hull and equipment. It is not now a question whether, as regards any particular part of the vessel, the care required is great or otherwise. The question is whether any care is required. What the care should be would depend, among other things, upon the part of the vessel involved, and the opportunity of the master to know of its condition. If any defect would be discoverable in the exercise of such superintendence of the vessel ordinarily demandable of a prudent master, he must be deemed to have discovered it. It may be said that he was not obliged to examine or to test life preservers for the purpose of discovering their condition or buoyancy, especially after the inspector had recently approved them. Let this be admitted. Nevertheless, if the master had reason to know that the inspection was superficial, or the life preservers were not according to the requirements, some duty rested upon him respecting these defective appliances. Whether it would be fulfillment of the duty to report and to protest to the owner is not now the inquiry. It is thought that it must be the master's duty to decline to navigate a vessel if the life preservers, to his knowledge, were so defective as to destroy their usefulness. Then they would be equivalent to no life preservers. It is not the duty of a master to provide a hawser or mooring line, but it is his duty to use some care to know when such a line becomes unfit or is growing unfit for service, and to make requisition for a new one. Life preservers, unlike hawsers, are seldom used, and are stowed away so that defects would be less obvious and not easily discoverable from mere external inspection. Perhaps the defects might be entirely latent. But all this bears upon the question of what would be discoverable in the exercise of such general care and watchfulness as is demanded of the master, and does not permit the conclusion that no care at all is requisite. The law treats the master reasonably and fairly. It does not place duties upon him that belong to his employers or to inspectors. But he commands a ship to which a multitude of persons is committed, and of him care somewhat measured by the responsibility resting upon him is required.

The discussion of the duty of the master of the vessel will be continued while considering the indictment against Van Schaick alone, but in this connection it is convenient to determine whether Barnaby, Atkinson, Dexter, and Pease are charged legally in indictments Nos. 1 and 2.

The officers of the company and Commodore Pease are indicted in one action for aiding and abetting the company, and in another action for aiding and abetting the master, Van Schaick. These officers and Pease do not fall within any class of persons named in the section that creates the offense. Hence the indictment cannot, by virtue of the statute alone, be sustained against them as principals. How, then, can they be charged? A person not falling within the class described in a

penal statute may nevertheless, under the rules of the common law, be charged, provided (a) he was present, actually or constructively, and aided or abetted another person in the commission of the crime; (b) or, being absent, counseled or procured or caused that person to commit the crime; (c) or aided him after he had committed the offense, for example, to escape. If the crime is a misdemeanor, the aider and abettor in any one of the three cases above named would be a principal, and should be charged as such. If the crime is a felony, an aider and abettor would be a principal in the second degree, if he was actually or constructively present when another committed the offense, or he would be an accessory before the fact, or after the fact, according as the case fell within subdivisions "b" or "c," above.

The counsel for defendant Barnaby and his associates contend that such defendants cannot be indicted as principals, because they are not named in the act, nor were they constructively or actually present aiding and abetting; that they cannot be held as accessories, or even principals aiding and abetting, as they did not, and, in the nature of the case, could not, do anything to aid or abet the principals in their alleged neglect of duty. Moreover, it is urged that the officers are charged as principals, and cannot be convicted as accessories, and also that the officers could not be charged as accessories or as aiders or abettors, of a corporation that could not be indicted for manslaughter because it could not be punished for it. These positions may be tested. The corporation was the owner. It violated its duty, and fell within the terms of the statute. But it is urged that it cannot be convicted under the statute. The statute makes the owner's "fraud, misconduct, connivance or violation of law," causing death, an offense. In this case the duty of supplying proper life preservers is commanded by the law. This affirmative command involves another command—that life preservers not in compliance with the law shall not be furnished. The corporation navigated without them, and caused death thereby. It is not necessary to show intention to kill, nor malice in fact.

But it is said that no punishment can follow conviction. This is an oversight in the statute. Is it to be concluded, simply because the given punishment cannot be enforced, that Congress intended to allow corporate carriers by sea to kill their passengers through misconduct that would be a punishable offense if done by a natural person? A corporation can be guilty of causing death by its wrongful act. It can with equal propriety be punished in a civil or criminal action. It seems a more reasonable alternative that Congress inadvertently omitted to provide a suitable punishment for the offense, when committed by a corporation, than that it intended to give the owner impunity simply because it happened to be a corporation.

But it is urged that the officers could not aid or abet the corporation in its misconduct. The fact is that the corporation could not be guilty of misconduct, except as some of its officers or employés not only aided and abetted, but also did the act or failed to act. Of course, it does not follow that, because a corporation committed an offense, its officers or directors either did act or failed to act as the law required, or aided or abetted. But some one or more natural persons must have been the cause of the default. In the action at bar the indictment

points to the persons, Barnaby and his associates, and charges that they "did then and there unlawfully aid and abet the said Knickerbocker Steamboat Company in its said fraud, misconduct and violation of law, and cause, procure, suffer and permit the said company then and there the said fraud, misconduct and violation of law, in manner and form as aforesaid, so to engage in and permit as aforesaid." It should be conceded that, if a duty to act was laid on the corporation, and it did not act, and its officers were inactive, and no duty was laid on them, they could not be charged with aiding and abetting. But here the charge is, in effect, that the officers procured the corporation and Van Schaick to violate the law, and aided and abetted therein. The defendants state that one cannot aid another to do nothing. One person can procure another to do nothing, and, when the law says "act," one person can induce, counsel, order, and even coerce another into inaction. When the law commands one person to furnish good life preservers, another, having the opportunity and control, can procure such person to furnish bad and death-causing life preservers; or, when life preservers become useless and dangerous, one person may have such relation to one whose duty it is to replace and to restore them as to induce him to ignore that duty. Here the corporation and Van Schaick are charged, in effect, with misconduct, in failing to furnish good life preservers, and in furnishing bad life preservers. Who procured them to do it? The indictment charges that the officers and Pease did. The defendants seem to consider that, if the law charges a person not to do something, and he does it, and another is an effective cause of the action, the latter could be an aider and abettor; but if the law charges one person to do something, and he does it not, the person who interposes to stay his performance of duty is not aiding and abetting. If the law provides that a corporation should not dig a ditch dangerous to human life in a particular locality, and it should dig the ditch, then its officers aiding and abetting by procuring such encroachment would be punishable. But if a corporation were commanded to guard a ditch by lights, and the officers directed that it should not be done, or procured its superintendent to omit to do it, would not such officers aid and abet the omission, and be liable to punishment? Here the statute or regulations command the corporation to put aboard and maintain a certain kind of life preservers. That means that it shall not put aboard those that do not meet the requirements, nor permit aboard appliances once proper that have become improper. Now the corporation omits to put on the required kind, but puts on the forbidden kind, and keeps them aboard and navigates with them, and death ensues. This is not passivity alone. It is destructive activity. To put on and maintain what the law says shall not be put on and maintained is an affirmative breach of duty. If no life preservers had been placed aboard, it would have been inertia, an indolent failure to obey, that would be equivalent to open defiance of the law. To place forbidden life preservers is affirmative and active disobedience of the law. To leave aboard such life preservers as the indictment describes was negligence on the part of some one or more persons, tantamount to reckless disregard of duty. A person who actually interposes to cause the disobedient inactivity, as well as he who inter-

venes to cause the disobedient activity, equally offends. It is useless to refer to cases where a corporation has been commanded to do something, and its officers or directors do nothing, or to cases where a corporation is ordered not to do something, and yet does it, and its directors are accused, although there is no evidence that they did anything or were bound to do anything. If the corporation alone is made criminally liable for nonfeasance or misfeasance, or it alone is charged with a duty, its officers not participating cannot be held for the corporation's default if the duty, in some lawful manner, was not placed on them. But when a corporation or an individual is charged to do or not to do a specified thing, under the penalty of punishment, the person who procures the default aids the breach of duty. Whoever seizes the hand and holds back one from performance of a duty is as guilty as one who, seizing the hand, draws forward the one forbidden to the commission of the thing forbidden. The indictments in the present case sufficiently charge both procurement to neglect doing a commanded act, and to do that which is a direct violation of the commanded act.

The next question is: (1) If the principal offense is a felony, are the officers properly charged in the indictment? (2) Is the offense a misdemeanor or a felony? If the former, the persons are properly charged with aiding and abetting. It will not be necessary to decide the second question.

As to the first question, it is urged that the officers could not become principals, because they were not present when the offense was committed. When was the offense committed? It was not consummated until the deaths occurred as the result of the violation of it. The fact that the defendants, one or all, were then absent, is unimportant. The inspection officers were only present at the inspection, but were absent at the deaths, yet that circumstance alone would not acquit them. The owner could not escape on the only plea that he was on shore when the deaths occurred. Even the master of the vessel might not be excused by the mere fact that he was temporarily ashore when the fire occurred. The fault is found in employing the deficient appliances. This fault ripened into a crime when such deficiency resulted in a death. It is charged that the defective life preservers were on the ship, and constructively tendered for use to the imperiled passengers, through a breach of duty on the part of the owner and master, and also because each caused them to be and to remain on the vessel, and that Barnaby and the other officers not only suffered and permitted the fraud, misconduct, and violation of law of the company, and the misconduct, negligence, and inattention of the master, but did "cause and procure * * * then and there" the same. The nature of the offense, perchance, precluded a single act of the company or master, at which an aider and abettor might or might not be present. The duty was continuing. It always rested upon the company. So far as the duty rested upon the master, it remained with him during his hours of service. The very existence of the offense of the company or the master depended upon its continuity, and the charge is that Barnaby and others "then and there" did "cause, procure, suffer, and permit." If it is possible to conceive of a person being an accessory in such a case, yet it is quite as logical to consider such an aider and abettor as a

principal. The government claims that it charges the defendants as principals, and, while the counsel for the defendants contend that Barnaby and his co-directors "can be held, if at all, only as accessories," yet in the same brief it is stated that, "having been indicted as principals, the defendant Barnaby and his co-directors cannot be convicted as accessories." This seems to be an admission by Barnaby that he and his associates are indicted as principals. Hence the indictment is correct in form, and that it was possible for them to be principals is quite evident from the nature of the offense.

It is gravely urged that, although there were bad life preservers to the extent of 900, non constat there were aboard with them the number of good life preservers demanded by law; that the indictment should, but does not, negative the presence of other life preservers sufficient in number and kind; and the inference is asked to be drawn that the person or persons charged with the duty with reference to them did such duty. The argument must be that the law did not forbid, as a part of the equipment for use, the employment of 900 bad life preservers, and the constructive tendering of the same to the passengers on the burning ship for use, and that, as the indictment does not charge that there was not the lawful allotment of good ones, the presumption is that there was, and no one violated the statute in question, although the use of one of the bad life preservers resulted in the passenger's death. The law required that the life preservers be furnished for the use of the passengers; when the passenger took one, in contemplation of law, he took one that had been furnished him to take; and hence the one he took, whereby he drowned, was one that the law forbade the person charged to furnish, and the one that should have been furnished in the place of the one actually provided was not furnished; and hence the person charged is brought in fault. Of course, the drowning man was in such plight that he could not return the bad life preserver and select one whose existence is now dependent on an alleged presumption of law; and, even so, how many of the 900 bad life preservers would it have been his mischance to select and try before he would have secured one of the good life preservers now presumed to be in esse because the indictment does not deny them being? It is possible that he must have saved his life 900 times before he reached a safe life preserver that was in accordance with the law. As stated on the argument, if the law require the provision of 1,500 loaves of wholesome bread, it would hardly be regarded as a compliance if provision were made of 900 poisoned loaves, because the 900 poisoned loaves would be deemed furnished for the passengers equally with the safe loaves. The wrongdoer would not be heard to say that he furnished only the good loaves in compliance with the law.

Some final discussion of count 3 of indictment No. 3, against Van Schaick alone, is desirable. The indictment charges that it was the duty of Van Schaick (1) to cause to be prepared and posted station bills for the deck and engine department, assigning a post of duty for every person employed on board; (2) to call, once in each week, all hands to quarters, and exercise them in the discipline,

and in the unlashing and swinging out of lifeboats, and in the use of fire pumps and all other apparatus for the safety of life on board in case of fire; (3) to see that all the equipments required by law were in complete working order for immediate use; (4) to see that the provisions of section 4471 respecting steam pumps, hand pumps, and suitable hose, "kept in order and ready for immediate service," were obeyed; (5) to see that the life preservers upon the vessel. were in good order and repair, and ready and accessible for immediate use, and that they met the requirements of the regulations. And it is further charged that the master (a) neglected to comply with the regulations as to the station bills and fire drill; (b) neglected to have attached to the steam pumps and hand pumps, and ready for immediate use, requisite hose, which on the main deck was weak, unfit, and unserviceable, and on the hurricane and promenade decks was not provided and attached to the hand pumps; (c) was negligent as to the life preservers; and that, through such neglect in regard to fire drill, suitable hose, and fire appliances, and useless life preservers, death was caused.

The duty of the master as to the life preservers has been heretofore discussed. What has been said in that regard is equally applicable to the requirements of section 4471, relating to steam fire pumps and other apparatus for throwing water, suitable hose therefor as directed, and also double-acting hand fire pumps, each having suitable, well-fitted hose, of at least one-half the vessel in length. It is not the primary duty of the master to provide such appliances, but, if they be not supplied, it would be his duty to take some measures, the nature of which would depend upon the existing conditions; and if the provision made was defective, and, in the exercise of the observation demandable of the captain, such omission or defect were discoverable, he would be deemed to know it, and thereupon it would be neglect of duty on his part if he did not exercise due care for the supply or restoration of the omitted or defective parts.

The matter of the fire drill and attention to the working order of appliances is treated by the inspectors' rule 5, § 15, quoted above. It purports to have been made pursuant to section 4405, Rev. St. U. S. [page 3017, U. S. Comp. St. 1901], which provides:

"The board [of inspectors] shall establish all necessary regulations required to carry out in most effective manner the provisions of this title, and such regulations when approved by the Secretary of Commerce and Labor, shall have the force of law."

The regulation (rule 5, § 15) requires of the master: (1) The preparation and posting of a bill assigning stations to the crew. (2) The summoning of all hands to exercise (a) in unlashing and swinging out the lifeboat; (b) in use of fire pumps and all apparatus for safety of life. (3) To see that all equipments are in complete working order for immediate use. (4) To enter the dates when exercise of crew was had. The neglect to enforce the rule is made cause for revoking the master's license.

The title of the act of Feb. 28, 1871, c. 100 (16 Stat. 440), embodied in title 52, is, "An act to provide for the better security of

life on board of vessels propelled in whole or in part by steam and for other purposes." The sections of the title fall within the title. The provision for inspectors of steam vessels and equipment, the provisions relating to the furnishing of fittings and appliances, and the workmanship, material, strength, and adjustment thereof, and the due relation of the parts, for the examination and licensing of masters, mates, engineers, the investigation of alleged breach of duty by any of such officers, and the removal therefor in proper case, for a full complement of licensed officers and full crew, and other requirements, illustrate that the protection of life and property is the vital aim of the statute. Consider appliances peculiarly exposed to the master's observation and scrutiny. Of what avail are steam or hand fire pumps and hose unless the same be kept in good order and ready for use? If, when the fire comes, the appliances are somewhere aboard, but the parts necessary for coaction are disconnected, unready for use, and even seconds of delay are caused thereby, all such appliances may be unavailable to stay catastrophe. And what if the crew be untrained and unexercised in the handling of the hose and the manning of the pumps, so that no man knows his place, and no one lends efficient and well-directed aid, or the crew disperses or crowds forward so confusedly that one defeats the aid attempted by another? Of what use then are fire pumps or hose or lifeboats, or the law that compels them to be furnished? Many tragedies on sea or land answer these questions. As seen above, the master is required by the regulations to assign stations for his crew, and post notices thereof; to exercise his crew in unlashing and swinging out the lifeboat, in the use of the fire pumps and other apparatus; and to see that all the equipments required by law are in complete working order for immediate use. Such duties, at least, among those attempted to be established by the regulations, pertain to him and his subordinate officers, in the very nature of their positions. A crew and pumps and hose and lifeboats, on the same ship, all unrelated, because no one has taught the crew how to connect and operate them effectively, would be snares tempting passengers to possible death. And who should use care to fit the crew for service in operating these appliances, if not the master, as the ultimate authority aboard, and the responsible commander? Who other than he should have knowledge, if the hose is absent, unconnected to the pumps, and why should he not, above all others, know if it was weak and insufficient? Is it not the duty of a master to cause it to be tested at proper intervals? Where the indictment charges such duties, it cannot be said that it is demurrable. The defendants deny the operative force of the regulations in connection with section 5344, upon the authority of U. S. v. Eaton, 144 U. S. 677, 12 Sup. Ct. 764, 36 L. Ed. 591, and U. S. v. Maid (D. C.) 116 Fed. 650. The decision in Flint & P. M. R. Co. v. Marine Ins. Co. (C. C.) 71 Fed. 210, aids the conclusion that the regulation is sanctioned. There it was held that:

"The rule of the supervising inspectors that all passenger and freight steamers shall have one of the crew on watch in or near the pilot house is authorized by Rev. St. § 4405 [U. S. Comp. St. 1901, p. 3017], requiring the

inspectors to establish rules necessary to carry out the statutory provisions as to steam vessels, among which is one that the vessel shall carry 'a full crew, sufficient at all times to manage the vessel.'"

The cases cited by the defendants involve attempts on the part of governmental agencies other than Congress to create crimes. The inspectors, by their regulation, do not create a penal offense. They declare a duty. A breach of it brings no penalty beyond some liability stated in title 52. But if the regulation be valid, a breach of it, resulting from the master's misconduct, negligence, and inattention, causing death, is manslaughter, because Congress, by section 5344, has provided that a breach of duty, so caused, whereby a person's death is effected, shall be such an offense. Section 5344 does not limit the "duties" of a master for its purposes to statutory duties. Almost the sum of a master's duties, whereon the lives of the persons on his own and other vessels depend, are not imposed directly upon him by statute. But the meaning of section 5344 is that if his misconduct, negligence, or inattention to his duties, however arising, causes the death of another, he shall be guilty of manslaughter. The enumeration in the statute of the duties, and what in relation thereto would constitute misconduct, negligence, and inattention, is beyond human possibility. It is said in U. S. v. Eaton, 144 U. S. 687, 12 Sup. Ct. 767, 36 L. Ed. 591:

"It is a principle of criminal law that an offense which may be the subject of criminal procedure is an act committed or omitted 'in violation of a public law either forbidding or commanding it.'"

A misinterpretation of this statement would lead to gross error. For illustration, the Penal Code of New York (section 195) provides:

"A person who, by any act of negligence or misconduct in a business or employment in which he is engaged, or in the use or management of any machinery, animals, or property of any kind, intrusted to his care, or under his control, or by any unlawful, negligent or reckless act, not specified by or coming within the foregoing provisions of this chapter, or the provisions of some other statute, occasions the death of a human being, is guilty of manslaughter in the second degree."

The killing of a human being is not an act. It results from acts done or omitted. This or any statute does not undertake to point out definite, causative act or acts, the commission or omission of which will bring a person within the statute. The variety of such acts or omissions from which culpable negligence may be inferred is infinite. Section 5344, Rev. St. U. S. [page 3629, U. S. Comp. St. 1901], provides that a master's misconduct, negligence, or inattention to his duties, causing death, shall constitute manslaughter. The master's misconduct, negligence, or inattention arises from breach of duties; that is, from acts or omissions to act. When the inspectors declare, confirm, and create a duty, they do not thereby render the breach of such duty a penal offense. Congress alone creates such offense. The entire title 52 cannot be read without perceiving how much dependence must be placed necessarily upon the master for the fulfillment of its provisions, and the necessity for care on his part, and responsibility for the observance of such care, are apparent. For instance, by section 4493 [page 3058] it is provided:

"Whenever damage is sustained by any passenger or his baggage, from explosion, fire, collision, or other cause, the master and the owner of such

vessel, or either of them, and the vessel, shall be liable to each and every person so injured, to the full amount of damage if it happens through any neglect or failure to comply with the provisions of this title, or through known defects or imperfections of the steaming-apparatus or of the hull," etc.

This is not conclusive in these actions, but illustrates the intended relation of the master to passengers and property committed to his care.   By section 4448 [page 3039] it is provided:

"All officers licensed under the provisions of this title shall assist the inspectors in their examination of any vessel to which such licensed officers belong, and shall point out all defects and imperfections known to them in the hull, equipments, boilers, or machinery of such vessel, and also shall make known to the inspectors, at the earliest opportunity, all accidents or occurrences producing serious injury to the vessel, her boilers, or machinery; and in default thereof the license of any such officer so neglecting or refusing shall be revoked."

Why should the officers be designated to point out defects and imperfections known to them?   They are selected because to them the knowledge is more likely to come, either from direct observation or from report, and because a duty rests upon such officers to exercise such observation, and provide by their discipline for such reports.

The conclusion expressed earlier is reiterated—that, unless the duty as to furnishing equipments and fittings be imposed expressly upon the master of a ship, it is not primarily his duty to provide them; but it is his duty, before navigating, to exercise care to know whether the ship has any equipment, whether it is apparently sufficient and in accordance with law, and, after the introduction of appliances and equipment, it is his duty to have some care respecting its maintenance, the extent of such care being dependent upon the master's opportunity to examine the appliance and perceive its condition; and, further, there are duties relating to the discipline of the crew in the use of appliances, that, in the nature of the case, demand his vigilant attention, lest such appliances, when the occasion for their use arises, be found useless, until the moment when they can aid in saving passengers and property has passed, because the crew is undisciplined and untrained in their operation.   Duties that relate to the operation of a vessel, and the use of appliances therefor, and for the protection of the vessel, her passengers and cargo, and the discipline of the crew in connection therewith, are presumptively shared by the master, if they do not devolve entirely upon him.   As regards a vessel navigating in domestic waters, there is a greater opportunity for the immediate supervision by the owner, and duties that elsewhere might fall upon the master may be transferred to others.   What dependence a master may place upon others under such circumstances, or to what extent his primary duties may have been taken from him and imposed upon others by the owner, or what he has done upon discovering defects, and whether his action thereon fulfilled his duty, are questions that can only be determined after the evidence shall have been presented upon the trial.

The demurrers should be overruled, with leave to plead over at the December term.