**UNITED STATES of America**

v.

**John Henry MECKLING.**

**Crim. A. No. 23495.**

United States District Court
D. Maryland.

June 5, 1956.

Walter E. Black, Jr., U. S. Atty., James H. Langrall, and Herbert F. Murray, Asst. U. S. Attys., Baltimore, Md., for the United States.

Harry Leeward Katz and John C. Weiss, Jr., Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

On August 12, 1955, at about 2:30 p. m., the sailing vessel Levin J. Marvel (Marvel) capsized and sank in Herring Bay on the Western shore of Chesapeake Bay, with the loss of 14 of her 23 passengers. Thereafter, a two-count indictment was returned against the defendant, John H. Meckling, the Marvel's master and part owner. The first count was brought under U.S.C. Title 18, § 1115, for misconduct, negligence and inattention to the duties of the master of a vessel, causing loss of life. The second count was brought under U.S.C.A., Title 46, § 526l and m for operation of a vessel in a reckless or negligent manner so as to endanger life. These sections read as follows:

> Title 18, Sec. 1115. "Every captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, and every owner, charterer, inspector, or other public officer, through whose fraud, neglect, connivance, misconduct, or violation of law the life of any person is destroyed, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
>
> "When the owner or charterer of any steamboat or vessel is a corporation, any executive officer of such corporation, for the time being ac-

tually charged with the control and management of the operation, equipment, or navigation of such steamboat or vessel, who has knowingly and willfully caused or allowed such fraud, neglect, connivance, misconduct, or violation of law, by which the life of any person is destroyed, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

Title 46, § 526l. "Reckless or negligent operation of vessels; prohibition

"No person shall operate any motorboat or any vessel in a reckless or negligent manner so as to endanger the life, limb, or property of any person."

Sec. 526m. "Same; penalty

"Any person who shall operate any motorboat or any vessel in a reckless or negligent manner so as to endanger the life, limb, or property of any person shall be deemed guilty of a misdemeanor and on conviction thereof by any court of competent jurisdiction shall be punished by a fine not exceeding $2,000, or by imprisonment for a term of not exceeding one year, or by both such fine and imprisonment, at the discretion of the court."

There should also be noted:

Sec. 526o. "Violations generally; penalties

"If any motorboat or vessel subject to any of the provisions of this subchapter is operated or navigated in violation of this subchapter or any regulation issued thereunder, the owner or operator, either one or both of them, shall, in addition to any other penalty prescribed by law than that contained in section 526m of this subchapter, be liable to a penalty of $100: *Provided*, That in the case of motorboats or vessels subject to the provisions of this subchapter

carrying passengers for hire, a penalty of $200 shall be imposed on the owner or operator, either one or both of them, thereof for any violation of section 526e, 526f, or 526g of this subchapter or of any regulations pertaining thereto. For any penalty incurred under this section the motorboat or vessel shall be held liable and may be proceeded against by way of libel in the district court of any district in which said motorboat or vessel may be found."

■ Defendant moved to dismiss the second count on the ground that although reference is made to "any motorboat *or any vessel*" (526l and 526m; see also Sec. 526o—"any motorboat or vessel"), these sections, which appear in 46 U.S.C.A. under the caption "Subchapter II. Motorboat Act of 1940 [NEW]" were not applicable to sailboats. The sections are part of Chapter 16 of Title 46, which as enacted in 1910 (36 Stat. 462) was entitled: "An Act to amend laws for preventing collisions of vessels and to regulate equipment of certain motor boats on the navigable waters of the United States"; and were added by amendment effective April 25, 1940 (54 Stat. 163), entitled: "An Act—To amend laws for preventing collisions of vessels, to regulate equipment of certain motorboats on the navigable waters of the United States, and for other purposes."

The stated purposes of the amendatory acts, together with the use of the disjunctive in sections 526l, 526m and 526o, coupled with the definition in U.S.C. Title 1, Sec. 3, that "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water",[1] requires the conclusion that Sections 526l and 526m are not restricted to motorboats, but apply to sailboats as well. The motion to dismiss was accordingly overruled[2] without prejudice to its renewal at the trial. It was renewed at

---

1. See also 46 CFR Secs. 26, 26.01–1 and 26.05–5.

2. No opinion for publication.

the conclusion of the trial[3] and again overruled.

The indictment in effect incorporated, with unusual specificity, a bill of particulars. In substance the charges, substantially identical as to counts 1 and 2, were that (1) defendant operated an unseaworthy boat with excessive rot in the structural members of the vessel, its hull structures and fittings; inadequately repaired; with port lights not closable and watertight; with inadequate and unsound bilge pumps; with a radio telephone transmitter in unsound operative condition; without a barometer; with an inadequate crew; without life boats, life rafts, life floats or other life saving equipment except life preservers; (2) that he took and sailed such vessel from a safe harbor, when he had reason to believe it would be subjected to a hurricane, with severe wind and sea conditions; (3) that he failed to take shelter, before this became impractical; and (4) that he placed the vessel in an unsheltered position, with knowledge of its conditions, limitations, and the existence of storm warnings.

These charges and the extensive testimony[4] in support and rebuttal thereof, as well as the unique nature of the case[5] and the seriousness both of the charges and the casualties, will unfortunately require a rather extended summary of the evidence.

The Marvel was a baldheaded[6] ram type[7], 3-masted schooner, built in Laurel, Delaware, about 1892, to carry freight, particularly lumber, and therefore without waterproof bulkheads. Its length at the water line was 125½ feet; the overall length from tip of bowsprit to spanker board was 179 feet; it was flat bottomed, with beam of 22½ feet and a centerboard of 22–24 feet; and drew 5½–6 feet when light. She carried 3 foresails—a flying jib, jib and forestaysail (with boom)—and a foresail, mainsail and spanker. The vessel could not sail closer than 6 points (67½°) to a head wind.[8]

A yawl boat, 18–20 feet long and about 4½ feet wide, with an 18 inch freeboard, was part of the equipment. It was used in docking and undocking; to counteract slippage; to assist in changing courses; and in light breezes or calms as a supplemental, or the only, means of locomotion. Often small rowboats were carried. There was no evidence that a "life boat" was ever part of the equipment of the vessel.

From 1944 to 1952 the Marvel was owned by a Captain Knust who rebuilt her for passenger service by installing nineteen double-berth staterooms, each with a porthole, and the building of a galley forward and a lounge aft. He also installed electric lights and running water in each stateroom, and equipped the vessel with a two-inch centrifugal

3. Defendant had moved for a transfer of the case from the District of Maryland on the ground of prejudice from alleged adverse publicity, unless the case could be tried without a jury. The Government consented to a waiver of jury trial, and the court concurred, in the interest of time, the convenience of witnesses and counsel, and economy.

4. The trial lasted 13 days, exclusive of arguments.

5. Counsel advise that this is the first reported case of "manslaughter by sailing vessel", or criminal prosecution of a master of a sailing vessel under U.S.C.A. Title 46, §§ 526l and 526m.

6. That is, without topsails.

7. The vessel originally ran lumber from the Carolinas to Baltimore. It sailed in competition with other similar vessels. The first to arrive obtained premium prices, which rapidly diminished with each subsequent arrival. The owner was paid for the cargo carried in the hull. The crew split up the freight from the deck cargo, which might be substantial because of the high boom clearances. These boats had heavy bowsprits, which might be used to "ram" (hence the name) sails on a competitor, so as to win the race.

8. The vessel had a "hog" (or arch, the bow and stern being lower than the middle) of 29 inches. While this was often an indication of age, there was some testimony that at least 14 inches of arch had been built in the Marvel at the time of construction. The condition was not a hindrance to navigation, and played no part in the disaster.

bilge pump [9] forward, mounted on wheels and operated by a 6 h.p. gasoline motor, and a motor operated pump aft of about one-half that capacity, together with a "walking beam" type of double pump, hand operated.

The sails were hoisted by a bulldog motor forward, with a four foot flywheel geared down to winch heads on each side of the engineroom forward. This motor also had a special attachment for raising the anchors. When lowered, the anchor gear was locked by a dog which required considerable effort to loosen. A new stern was put into the vessel and a number of new deck beams. The old deck beams were not removed but the new ones installed alongside of them.

Captain Knust operated weekly sailing cruises, beginning about the first of June; and each year in March, had the boat drydocked, caulked to two planks above the waterline, and any faulty planks within that area replaced with sound ones. He carried $18,000 fire insurance on the vessel, which was annually inspected by a representative of the insurance carrier. After several years ownership, Knust bought an R.C.A. transmitting and receiving, two-way radio telephone. This had four radio telephone channels, one to Norfolk, Virginia, one to Wilmington, Delaware, one for distress signals and one for ship to ship communication.

In the fall of 1952 Knust had the hull overhauled in a boatyard and then laid the boat up in fresh water for a year and a half before selling it to the defendant. He testified that during the time he owned it, it had handled well and that it had had a "nice disposition". He customarily had a crew of a master, mate and two college boys as deck hands, together with a chef and a steward.

The defendant had been interested in boats from childhood; had sailed 65–70 foot boats on the Great Lakes, and sailed off Maine for one year; had been in the Coast Guard four years, and had moved into the Chesapeake Bay area late in 1950. In the early part of 1954 he became interested in buying the Marvel and discussed its history with Knust, checked on repairs which had been made, and spent Memorial Day week-end going through the vessel and checking everything to be seen. To him, the hull seemed in very good shape, although some flooring was missing. All the running tackle was off; the sails being stored in a loft.

After purchasing the Marvel, new flooring was installed by defendant wherever necessary and the supporting timbers to which the flooring was attached appeared to defendant to be of good, sound lumber; so good that it was hard to drive in nails. After buying the vessel, he bought all new running gear and a new mainsail, installed a new generator and batteries,[10] and rebuilt the forward pump. He also replaced the 90 h.p. marine engine in the yawl boat with a 150 h.p. automobile engine, and a marine transmission of two to one ratio. He took the vessel to a marine railway in Baltimore where something over $1400 in work was done to the hull.

The radio and license were turned over to the defendant by Knust. Defendant had the license renewed with the same call letters. For optimum results a different length antenna for each of the four frequencies would be required but defendant, by experiment, positioned the loading control at a point at which with a single antenna, substantially equal loading on each frequency could be attained. He then disconnected the set screw on the shaft so that the knob could

---

9. Water from the wash basins in each stateroom emptied into the bilge, which was pumped two or three times a day. The two toilets had underwater outlets.

10. In 1955, a supplemental 36-volt generator was installed. The generator was kept running until the boat was docked, and directly supplied the 36-volt lighting system. When the generator was not running, the lights were switched to five batteries producing 30 volts.

The radio was operated at 12 volts by a separate line from two batteries.

not be turned from the outside of the case.

The defendant ran "weekly" cruises which began about June 1, 1955, started from Annapolis on Monday noon, and ended at Annapolis about noon on Saturday. The route followed, whether up or down the Bay, depended somewhat upon the prevailing winds.

On August 8, 1955, the Marvel sailed from Annapolis at about three p. m., with a crew of the defendant as captain, with McDougall, a 17-year-old boy as deckhand, and a cook and steward. It had been customary to have two or three deckhands,[11] but on this trip one who had sailed on every other trip had business ashore, and another who had been engaged for the trip, was discharged at the last minute for justifiable reasons.

The Marvel sailed eastwardly across the Bay and anchored beyond Poplar Island around dusk, and remained there over-night. The next day, the Marvel sailed to and up the Choptank River to Oxford, arriving in the evening. During this portion of the trip, there was considerable anxiety about hurricane Connie, which was then reported some 500 miles at sea, east of Miami. The weather reports from official and commercial broadcasts were received by radio every fifteen minutes to half an hour, and the indication that hurricane winds might reach the Bay area Thursday afternoon, was one of the reasons for going into Oxford. Early Wednesday morning the radio forecasts were more ominous, still indicating that the hurricane might strike the Bay area some time Thursday. The defendant then decided to go from Oxford, some nine miles from the mouth of the river, to Cambridge, nine miles further up the river, where docking facilities were very much better. The vessel left Oxford Wednesday morning and arrived at Cambridge Wednesday evening. Everything was battened down and extra cables and lines were put out.

Thursday morning was a beautiful sunshiny day, but the weather reports still indicated the possibility of hurricane weather in the evening, and hurricane alert warnings which had been outstanding for several days were still in effect. The passengers were anxious to continue the trip but the defendant was reluctant to leave Cambridge because of the weather reports. He decided, however, to move across the river to a bathing beach from which he could readily return if a heavy blow started. While anchored across from Cambridge he received the following 1 p. m. Weather Bureau forecast from Friendship Airport.

"Weather Bureau Friendship Airport 1 PM EST August 11 1955

"Termination of Hurricane alert:

"Hurricane Connie is expected to move inland over the North Carolina Coast about 9 PM EST and it is likely to lose much of its force as it moves over land. It is not expected to produce hurricane winds in this area but as it moves northwestward winds will increase to possibly as high as 35 to 40 MPH from the northeast to east over the extreme southern Maryland Bay and coastal areas and 15 to 30 MPH over northern and central sections. Tides in the extreme southern Maryland Bay and coastal areas are likely to rise as much as 3 to 5 feet above normal and about 1 to 3 feet above normal central and northern sections on Friday. Cloudiness with showers and rain associated with Connie will occur over Maryland and Delaware but the heavier rains are expected to remain to the south."[12]

Expert testimony with respect to weather forecasting in the area generally, and hurricane warnings specifically, was offered. In substance, it was that the responsibility of reporting primary data with respect to the progress of hurricane Connie up to Hatteras was in the Miami Weather Bureau, from which

11. The defendant's brochure advertised a six-man crew.

12. There is no signal for a "hurricane alert" as distinguished from a "hurricane warning."

point northward responsibility for reporting was assumed by Washington. Broadcasts for the Maryland area were primarily made from Friendship Airport, which endeavored to give as much local information as possible, including forecasts of wind velocity. Three regular daily broadcasts are scheduled by Friendship but in emergencies the number of releases would be materially increased. Visual indications of weather forecasts for the benefit of vessels are posted at various locations along the waters, one of these being at the Cambridge Yacht Club. The one which is of particular significance in this case is the northeast storm warning which is indicated during the day by a red triangular pennant having beneath it a square red pennant with a square black center. These northeast storm warnings were issued and had been posted at 2 p. m. on August 8, 1955 and were continued until 9 a. m. August 13, 1955. Such storm warnings are indicative of anticipated winds from the northeast of a velocity of between 30 and 73 miles per hour.

The decided weight of the credible evidence is that the northeast storm warning was flying from the Cambridge Yacht Club flagpole during the time that the Marvel was across the river on August 11 in the bathing area, and that it would have been clearly visible from the Marvel. The defendant's testimony was completely inconclusive as to whether he, in fact, saw the northeast storm warning before leaving Cambridge, but he admitted that he would have assumed such warnings were posted. The defendant said he received "the substance" of the Weather Bureau Friendship Airport broadcast at 1:35 p. m., August 11, 1955, as follows:

"Weather Bureau Friendship Airport 1:35 PM EST August 11 1955

"Northeast storm warnings for Chesapeake Bay are continued 1 PM EST for northeast —— Winds 15–25 MPH gradually increasing Friday to gale force or higher in the lower Bay area. Hurricane alert ended at 1 PM EST for area north of Virginia Capes.[13]

Based upon the forecast of winds of 15 to 30 miles per hour, very shortly thereafter reduced to 15 to 25 miles per hour, and the then existing pleasant weather conditions, the defendant decided to leave the Cambridge location and proceed up the Bay. Winds of a velocity of 15 to 25 miles per hour were, according to the evidence, ideal for sailing the Marvel. While northeast winds obviously were not the most desirable for sailing in a generally northerly direction, the evidence clearly established that with such winds of 15 to 25 miles per hour, the voyage from Cambridge to Annapolis could have been completed in 8 to 10 hours, depending, in part, upon tidal conditions.

The announced intention of the defendant was to sail toward Annapolis but as the cruise still had nearly two days left, he was undecided whether he would work his way up to the Bay Bridge or stay to the south of Annapolis, but in either event, he intended to anchor that night within a half day's run of the terminus.

The Marvel left its anchorage opposite Cambridge at about 1:30 p. m. on Thursday, August 11th. The winds, in fact, did not for some hours rise above 8 miles per hour, which made for very slow progress—in the nature of 1 knot per hour—so that the vessel did not reach Sharp's Island Light until about 9:00 p. m.

13. It should be noted that the specific forecast of winds of 15–25 miles per hour is lower than the 15–30 mile per hour forecast 35 minutes previously, and that both would appear to be inconsistent with "northeast storm warnings" which indicate winds of 30–73 miles per hour. This apparent conflict was the source of much controversy during the trial, the Government in substance contending that the general conditions indicated by a northeast storm warning should have been accepted by the defendant rather than the specific velocities which were broadcast.

While the Marvel was slowly sailing down the Choptank, McDougall and several of the passengers went in the yawl to Oxford to pick up supplies for an evening party. On the way back the strainer clogged and the motor repeatedly overheated. In addition, trouble was experienced with a slipping transmission, but McDougall felt that he satisfactorily adjusted this by tightening several nuts on the transmission shaft which had become loose. When the yawl caught up with the Marvel, McDougall told the defendant of the trouble; the defendant went to the yawl and testified that he cleared the strainer and checked the transmission, which he found to be fully operative.

The very light winds continued until about 3:00 a. m. on August 12th, at which time the Marvel was 2 to 3 miles above Sharp's Island. In the meantime, the following Weather Bureau broadcasts had been received:

"Weather Bureau Washington National Airport 5:14 PM EST August 11 1955

"Lower Potomac and Chesapeake Bay:

"Northeast storm warnings remain displayed except hurricane warnings in Norfolk area. Easterly winds slowly increasing reaching 15/25 MPH over north and 25/35 MPH over south portion during the night and reach (sic) 20/30 MPH over north and probably gale force over south portion Friday. Occasional rain and scattered thunderstorms. Rain over south portion by late tonight or Friday with fair to poor visibility. Hurricane Connie off Carolina coast moving slowly north-northwest. Watch for latest advisory on hurricane."

"Weather Bureau Friendship Airport 6:00 PM EST August 11 1955

"Alert for hurricane Connie ended for Maryland area at 1 PM today. Hurricane will go into the North Carolina Coast near Wilmington N C during the night, but northeast storm warnings still remain displayed on the Chesapeake Bay and Maryland Coast. With the northward movement of this storm during the night overland, squalls and gale force winds can be anticipated over the southern Maryland area late tonight (sic) and Friday, spreading northward into the northern sections of the State late in the day."

"Weather Bureau Washington National Airport 11:14 PM EST August 11 1955

"Northeast storm warnings remain displayed except hurricane warnings in Norfolk area. Easterly winds slowly increasing reaching 15/25 MPH over north and 25/35 MPH over S portion during the night and reaching 25/35 MPH over N and gale force over south portion Friday possibly hurricane force Va Capes area. Occasional rain becoming heavy over south portion with poor visibility. Hurricane Connie off Carolina Coast moving slowly northward. Watch for latest hurricane advisories."

The radio was turned off at about midnight of August 11th, and was not turned on until about 6:00 a. m. on August 12th. At about 3:00 a. m. on August 12th, the wind breezed up to about 10 to 12 miles per hour and a drizzle set in. The Marvel made several tacks across the Bay, the last bringing the vessel behind Poplar Island bellbuoy at about 7:30 a. m. The wind by that time had increased to 15–18 miles per hour and several gusts of higher velocity were encountered. Had the Marvel been able to start on its next northerly course, it should have been able on that tack to make the Severn River or at least South River. However, because of the lull after one gust, the vessel had lost headway and McDougall was sent in the yawl to turn the bow of the vessel accordingly. He started the engine without too much difficulty but found that he could obtain no traction since the clutch was slipping. Water had accumulated in the bottom of

the yawl to a height that the clutch had been completely submerged and, in its wet condition, would not grip. While McDougall was endeavoring, without success, to turn the Marvel, she was hit by a gust estimated at about 40 to 60 miles per hour and lost [14] all her canvas except the staysail and the spanker.[15]

Had the yawl been operative, it is possible that the Marvel, even after losing its sail, could have been pushed or pulled behind Poplar Island. With but the two sails and the inoperative yawl, the only alternatives were to anchor or to proceed almost in a straight line across the Bay to the Western shore. The Marvel was not anchored, the explanation being first, that the location was within the ship channel of the Bay, with poor visibility and with no flares or similar warnings available; and second, the defendant did not think that the vessel was in any danger. With only the staysail and spanker, the vessel could not run south to the Patuxent and of course could make no northerly progress. It would have taken about three to four hours for the captain and one deckhand to transfer the spanker sail to the foremast, which would have permitted the vessel to have pursued a southerly course.[16] The defendant proceeded westerly to Herring Bay,[17] where he anchored about a mile and a half off shore, just short of an 11 foot shoal and a 4 foot bar. He expected the hurricane to pass by at sea, which would have been followed by southwest or westerly winds, permitting him to complete the voyage with the remaining sail. The first anchor failed to hold and with the assistance of passengers, the second anchor was lowered and the two then held the vessel. The anchoring was completed at or a little after 9:00 a. m.

The yawl had not been raised out of the water on davits where it might have been dried out, but had been towed across the Bay by the Marvel with its engine running the entire time but apparently the clutch still failed to afford any traction. The yawl was lost some time during the morning, it being uncertain whether the yawl sank or broke its lines and drifted away. The defendant testified that if the yawl had been operative, he could, at the time they anchored, have taken passengers ashore in it but he still did not feel there was any danger.

14. An apparently contradictory statement had been made by the defendant at a hearing before the Coast Guard, in which he was reported as stating that he had "taken down" the sails. He explained that he understood the question to be whether "all" the sails had been blown down and that as the spanker had not and he subsequently lowered it, he had answered that he had taken down sail but did not volunteer the information that most of it had been blown down.

The weight of the credible evidence is that the Marvel was left with only the staysail and spanker.

15. It was about this time that the following broadcast was received:
"Weather Bureau Friendship Airport 7 AM EST Aug 12 1955
Special Bulletin on hurricane Connie:
"The latest information on the hurricane indicates a speeding up of the storm in a north northeasterly direction today. At 5 AM this morning it was located 45 miles south of Morehead City N C. The center of the hurricane should pass near Cape Hatteras N C around noon today and continue north northeast over the Ocean. There is a good possibility of an increase in the forward speed which is now about 12 MPH. Northeast storm warnings continue along the coast and over the Chesapeake and Delaware Bays, but, in view of the above information, all interests in coastal areas of Maryland and Delaware should watch later advisories for possible extension northward today of hurricane warnings. The center of the hurricane is expected to be out at sea off the Maryland Delaware coasts tomorrow morning. Meantime seas will be increasingly rough and tides will continue above normal so that all previous precautions should be continued. Later information will be issued when available and bulletins when warranted."

16. With a deck crew of the captain and two or three deckhands, the change could have been made in one to two hours.

17. The "Bay" is a rather shallow indentation and afforded no protection from winds from the north, east or south.

At 10:00 a. m., the defendant attempted to reach Norfolk by the ship to shore telephone in order to verify the weather reports,[18] but was unable to obtain any response. He made no further effort to communicate with Norfolk and at no time tried to reach Wilmington.

At about the time that the sails were lost, some water had accumulated in the bottom of the vessel but it was pumped out. After anchoring, water again started to rise. The forward pump would not work. It had no cover and as fast as the motor could be started, it would short out from rain and spray. The emergency duplex hand pump was brought forward and was worked by the passengers for a considerable period of time, until it clogged. The after motor-operated pump was taken into the dining room and a porthole was opened for the discharge of water. This pump operated until half an hour before the vessel capsized, but could not keep up with the water.

The source of the water was not definitely established other than that some undoubtedly came in through the anchor shaft forward and some through several of the portholes.[19] There was some suggestion that the Marvel might have struck some object on the passage across the Bay or that some caulking might have been dislodged.

From the time the sails were lost, the wind blew steadily at 35–45 miles per hour but the seas kept building up until they reached a height of 20 to 25 feet.

At 1:00 p. m. the defendant attempted to send out a "May Day" or distress signal over the distress frequency. He received no response, although the receiver functioned adequately with respect to the reception of broadcasts generally. A second "May Day" call was sent out between 1:15 and 1:30 p. m. to which also no response was received. The defendant testified that he requested one of the passengers to keep the sending key depressed since this would "beam" the location of the Marvel.

There was a substantial conflict in the testimony as to the condition of the radio transmitter. Two passengers who were electronic engineers examined the set between 1:00 and 1:30 p. m. and questioned whether it was functioning and able to transmit at those times.[20] However, there was uncontradicted testimony that the two calls were received by the owner of an ordinary shortwave re-

18. There had been confusion, and even some attempted humor in extremely bad taste, in some of the "disk jockey" weather reports.

19. A substantial amount of evidence was offered with respect to the condition of the portholes. The porthole cover was fastened by a pivoted screw bolt at the end of which was an adjustable butterfly nut. The evidence rather clearly established that very often these nuts would be unscrewed from the pivoted bolt and frequently were lost. An apparently adequate supply of spare nuts was carried.

The portholes were not fully watertight when closed unless the butterfly nut was tightened by a wrench. I find from the weight of the credible evidence that some of the portholes could not satisfactorily be closed because of mechanical difficulties. I find further that undetermined but probably not substantial quantities of water came through the portholes.

Shortly after anchoring, the captain was advised that some of the portholes were open. He asked one of the passengers to fasten them and told him where spare butterfly nuts could be obtained. Because he received no further report, the defendant "assumed" that the portholes had been properly closed. Apparently he made no inspection himself during the approximately 5 hours the vessel was anchored.

I further find that the condition of the portholes would not of itself have been a cause of the foundering.

20. The weight of their testimony is materially affected by the fact that reference was made to the inability to move the loading knob because the shaft had "rusted". As previously explained, the knob had been disconnected from the shaft; and as the shaft was of plastic construction, it could not have been rusted in the ordinary sense of that word. Moreover, the test, made by one of these witnesses, involving placing a wire into a 36 volt light socket and then connecting it with tubes designed for a 12 volt current, appears a trifle unorthodox.

**618**

ceiver at a point on the shore about a mile and three-quarters from the vessel, and only a short distance from Herring Bay.[21] I therefore find by the weight of the credible evidence that the vessel's radio was capable of sending at least weak distress signals between the period of 1:00 and 1:30 p. m., when the water was rising faster than the pumps could handle it.

The defendant realized that the vessel would ultimately have to be abandoned and the passengers were told to put on life preservers. By this time, the seas had risen to the point that the bow of the vessel would not rise after each wave but would be submerged for perhaps two or three consecutive waves. The defendant then for the first time felt that there was "immediate danger". He then contemplated "junking" the anchors to let the vessel drift in closer to shore but because of the volume of water on the deck, was unable to reach the capstan and loosen the dog or lock.

The defendant did not carry the two row boats that Knust had had on the Marvel. Defendant said that they were only a source of danger; that the passengers, if permitted to use them in good weather, would either row too far or overload them, or both. He was positive in his opinion that row boats would have been of no value when he decided to abandon ship. He doubted if they could have been launched even with an experienced crew, and was certain they would have been swamped by the first wave they met.

The captain then told the passengers to assemble in the lounge aft, and instructed one of the passengers to begin passing a line through the straps of the life preservers. His idea was that the passengers could be kept together and that those in distress could at any time be helped by those in a more fortunate situation. The line was fastened to the life preserver of one passenger and had been passed loosely through the straps of the life preservers of two other passengers[22] but not tied when the vessel suddenly capsized, at about 2:30 p. m.[23] Apparently, all of the passengers were thrown free or by some means emerged from the lounge as the testimony is clear that the decking over the lounge was immediately torn loose and floated away, and that there was no one then inside it. By some means the two passengers through whose life preserver straps the line had been loosely passed became "unthreaded". The defendant seized the line fastened to the first passenger but was unable to hold it and instructed her to untie the rope so that she would not become tangled. When she was unable to do so, he was able to loosen it himself. He then collected two other passengers and with McDougall, they were able to remain afloat and gradually drifted toward shore during some three hour's exposure, until they reached a duck blind, from which they were subsequently rescued by a small boat.[24] The steward, cook and 6 other passengers reached shore after being in the water from 3 to 5 hours. Fourteen passengers were drowned.

21. The recipient of the calls could not recall whether or not the location of the vessel was given; and the defendant did not testify to giving such location in the two distress calls.

22. Although numerous explanations were attempted, I have been unable to understand the procedure which was proposed by the defendant. The desirability of keeping the passengers together, if possible, may be accepted, but to have 23 persons loose on a single line, like curtain rod rings, where they could be thrown against each other and easily become tangled in the loose rope, would seem an extremely risky expedient.

23. There is direct conflict in the testimony as to whether the vessel ever righted itself. There is, however, no evidence that the ultimate loss of life would have been different regardless of which version is correct.

24. The defendant's conduct after the capsizing of the Marvel was in the best standards of naval tradition.

Three days after the wreck, two Navy divers located the hull of the vessel in 22 feet of water and they found it sitting on an even keel on hard bottom. Most of the deck had washed away and there was primarily left "a gutted out hull". The stern had broken up and was torn away from the hull. A visual examination was made of most of the hull and no breaks in it were observed although no effort was made to probe the individual planks.[25]

As additionally bearing upon the structural condition of the vessel, it might be noted that two of the youths who frequently acted as deckhands had been negotiating with the defendant for the purchase of the Marvel. The price which they had offered to pay was substantially in excess of that paid by the defendant, which fact was known to the would-be buyers. They had served on the vessel for a total of several months and had, therefore, had unusual opportunity to examine any exposed parts. They made such physical examination as was possible (including a superficial underwater examination in home-made diving rigs) and had also probed some of the framework after removing a portion of the flooring in the crew's quarters. For this purpose, they used an ice pick, the point of which was broken in such probing. They had also made inquiries of several former owners of the vessel and of two of the shipyards in which the vessel had been repaired.

In addition to the foregoing facts, and as bearing upon the question of criminal responsibility, the Government strongly urged that the admitted absence of any barometer on the Marvel was a direct contributing cause of the catastrophe; that if defendant had had a barometer, he would have noted its fall, and either would not have left Cambridge, or would have put in to shore before losing sail.

The opinion evidence of the witnesses as to the utility of a barometer varied from "indispensable" through "important" to "wouldn't have one if you gave it to me". Knust had had a barometer on the Marvel, and simply "overlooked" giving it to defendant on the sale of the vessel. Defendant, although having occasionally used a barometer in the past, did not consider it necessary on the Marvel. Its trips were always in sheltered waters, within sight of land, and he relied on the radio weather reports.

As to the period in question, the Government's expert testified that while there had been a steady drop in the barometer, and a "more than ordinary one" during the period from midnight to 4:00 a. m. on August 12th, that drop had not been "too much", and of itself would not have established danger, nor have disclosed significant information with respect to velocity.

■ I therefore find as a fact, and conclude as a matter of law, that the failure of defendant to carry a barometer on the Marvel had no causal connection with the loss of life, and did not constitute negligence.

■ The Government also contended that for defendant to leave Cambridge just after the hurricane alert had been terminated, and with northeast storm warnings up, was a "calculated risk" for the results of which he must answer criminally. It is claimed that he should have listened to the Miami broadcasts and himself have plotted the course of the hurricane, and from such plotting, plus the northeast storm warnings, and the *general* language of the local broadcasts, he should have concluded he would encounter exactly the kind of weather he in fact met.

With this I cannot agree. With the condition of the weather on the day when

25. Their testimony indicated the existence of rot where the deck and the hull joined. Probing was done in this locality but not of the hull itself. As there is no evidence that the capsizing or foundering was associated with rot in these quarters, the conclusion to be drawn from their testimony is not significant.
One of the divers testified that 50% of the ports were open.

he sailed, and the *specific* forecast of wind velocities, he had the right as a reasonable man to expect to make Annapolis, or other Western shore havens, with safety. It does not seem reasonable to me to expect the master of a sailing vessel in Bay waters to duplicate the work done, with far greater facilities and experience, by Governmental weather bureaus established for that very purpose. I think the defendant was entitled to rely upon the specific velocities forecast; that he was not required, and had no reason, to substitute his judgment for that of the official local broadcasts; and that in sailing from Cambridge and proceeding up to the point where the sails were lost, his conduct was that of a reasonably prudent master.

Different questions are, however, presented from that period on. A number of possibilities of averting, or reducing the risk of, loss of life, are found in the evidence:

(1) Had there been an adequate or even usual crew aboard, one member could have been kept in the yawl to bail it, or the yawl could have been hauled aboard and kept dry, or dried out, in which event the clutch would have worked, and the loss of sails might have been averted, or the vessel guided to shelter behind Poplar Island, or down the Bay.

(2) Had the yawl so been operative, passengers might have been taken ashore, or help obtained from the shore.

(3) Had the defendant at any time flown or given visible distress signals, they might have been seen.

(4) Had the defendant used his radio transmitter more frequently, communication with Norfolk, Wilmington, other ships, or the Coast Guard, might have produced assistance. The absence of any response if repeated efforts to transmit produced no response, should certainly more promptly and strongly have impressed him with the seriousness of the situation.

(5) Had there been an adequate crew, the spanker sail could have been transferred to the foremast, which would have permitted navigation to the south, or perhaps a beaching at Holland Point in Herring Bay.

(6) The assumption by defendant that a sailing vessel with only a staysail and spanker, and that could only proceed to an unprotected lee shore, was not in danger until it was too late to do anything but abandon en masse, and too late to junk the anchors and get in as close to shore as possible [26] was an unwarranted lack of reasonable caution and prudence that increased the risk to the passengers.

But the foregoing, and any other possibilities suggested by the evidence, are only possibilities, or at the most probabilities, so far as the loss of life is concerned. The conclusion of Admiral Richmond, Commandant of the Coast Guard, in hearings on H.R. 7952 and H.R. 8267, and from the stand in this case, was:

"But the Marvel was in a very bad position when they got in on shoals on a lee shore. As I say, if it had been a power-driven boat, and the engines had failed—it is entirely possible that the most seaworthy vessel would have foundered under comparable conditions."

I accept this testimony, and adopt it as a finding of fact.

▮ I am, therefore, unable to find beyond a reasonable doubt that there was misconduct, negligence [27] or inattention

---

26. The defendant and other witnesses graphically describe the pounding of the surf on the nearby shoals as contrasted with the heavy waves where the Marvel was anchored. However, for the passengers to reach shore, it was necessary for them to pass these shoals. Therefore, the closer the vessel ultimately could have been brought to land when it was decided to abandon ship, the less would have been the exposure of the passengers.

27. Defendant contends that U.S.C., Title 18, Sec. 1115 is a homicide statute relating specifically to manslaughter; that it applies manslaughter to a certain class of persons with a specific penalty for the particular offense; and that ac-

on the part of the defendant that resulted in the destruction of life, and accordingly find the defendant not guilty on the first count.

■ ■ However, on the facts and for the reasons above set forth, I do find beyond a reasonable doubt that the defendant was negligent [28] within the meaning of U.S.C.A., Title 46, § 526*l* and m; that such negligence endangered life; and that the defendant is guilty on the second count.

cordingly "gross" negligence is necessary for a conviction. Reliance is placed upon Moreland, The Law of Homicide; Foster, Criminal Law (2 ed. 1791) 264–265; Note, 1930, 28 Mich.L.Rev. 933, 934; Green, The Negligence Issue, 1928, 37 Yale L.J. 1029; Perkins, A Rationale of Mens Rea, 1939, 52 Harv.L.Rev. 905, 914–15; Turner, The Mental Element in Crimes at Common Law, 1936, 6 Camb. L.J. 31, 40, and cases cited, in the foregoing texts and articles; Neusbaum v. State, 1928, 156 Md. 149, 143 A. 872; Duren v. State, 1954, 203 Md. 584, 102 A.2d 277; and State of Maryland v. Chapman, D.C.Md.1951, 101 F.Supp. 335 (in which Judge Chesnut expressly stated he was applying Maryland law, 101 F. Supp. at page 337).

The Government contends that since 1838 the crime alleged in Sec. 1115 was different from common law manslaughter, and does not require "gross" negligence. The counterpart of Sec. 1115 originated in 5 Stats. at Large 304, except the section then contained the words "shall be deemed guilty of manslaughter", and contained no provision for a fine. It was re-enacted in 1905, 33 Stats. at Large 1025, and again in 1909, 35 Stats. at Large 1144, but with the reference to manslaughter omitted. This was part of the general revision of the penal laws, and in the Senate Report it was stated that the only change in the section was "the omission of redundant language" and the imposition of a fine. On the floor, it was explained that manslaughter had been divided into two degrees, and that it was better "to leave the section stand so that it would cover either class". 42 Cong.Rec. 1190.

Title 18, United States Code, 1940 Edition, Section 461, in the re-codification of the Criminal Code in 1948, became Section 1115. Under the heading of "homicide" there were five separate sections:

Section 1111—Murder.
Section 1112—Manslaughter.
Section 1113—Attempt to Commit Murder or Manslaughter.
Section 1114—Protection of Officers and Employees of the United States.
Section 1115—Misconduct or Neglect of Ship Officers.

The crimes of murder and manslaughter are again defined substantially in the same form as in 1909, and Congress again maintained a separate section pertaining exclusively to misconduct, neglect, or inattention of ship officers. It should also be noted that while Section 1114 specifically provides that punishment shall be as provided in Sections 1111 and 1112, this is not done in Section 1115, but a separate and different penalty is provided.

The only reported decision found after the omission of the word "manslaughter" from what is now Title 18, Sec. 1115, is United States v. Abbott, 2 Cir., 1937, 89 F.2d 166, where the charges correctly given and those which should have been given are couched in terms simply of "negligence" (89 F.2d at page 170). The earlier decisions primarily proceeded on the basis of the statutory language —"misconduct, negligence, or inattention" to duty; U. S. v. Warner, D.C. Ohio 1848, 28 Fed.Cas. p. 404, No. 16,-643, different crime from common law manslaughter; Charge to Grand Jury, D.C.La.1846, Fed.Cas.No.18,253,—same; U. S. v. Farnham, C.C.N.Y.1853, 25 Fed.Cas. p. 1042, No. 15,071; U. S. v. Collyer, C.C.N.Y.1855, 25 Fed.Cas. p. 554 No. 14,838; U. S. v. Keller, C.C.W. Va.1884, 19 F. 633; U. S. v. Holmes, C.C.Ohio, 1900, 104 F. 884; U. S. v. Van Schaick, C.C.N.Y.1904, 134 F. 592; affirmed Van Schaick v. U. S., 2 Cir., 1908, 159 F. 847; see also, U. S. v. Beacham, C.C.Md.1886, 29 F. 284.

Since on this count I have not been able to find beyond a reasonable doubt that misconduct, negligence or inattention on the part of the defendant resulted in the destruction of life, it becomes unnecessary specifically to decide whether the characterization of "gross" would be a prerequisite to liability.

28. "Negligent" as used in U.S.C.A., Title 46 § 526*l* and m would seem clearly to mean failure to use that care which a reasonable man would exercise under similar circumstances. U. S. v. McHugh, D.C.Pa.1952, 103 F.Supp. 740, 742; U. S. v. Bahen, D.C.D.C.Md., 1955, Criminal No. 23005. Should, however, the statute require a finding of "gross" negligence, I so find.